**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO.: 22-cr-20352-BB**

UNITED STATES OF AMERICA, )
)
Plaintiff, )
v. )
) August 17, 2022
JOHNNY MATTHEW BATTLE, JR., )
) Pages 1 - 57
Defendant. )
_________________________________/

ARRAIGNMENT AND DETENTION HEARING

BEFORE THE HONORABLE JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

On behalf of the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE
99 NE 4th Street
Miami, FL, 33132
BY: HAYDEN P. O'BYRNE, AUSA

APPEARANCES CONTINUED:

On behalf of the Defendant:

FEDERAL PUBLIC DEFENDER'S OFFICE
150 West Flagler Street
Suite 1500,
Miami, FL 33130
BY: STEWART G. ABRAMS, AFPD

Transcribed by:

BONNIE JOY LEWIS, R.P.R.
7001 SW 13 Street
Pembroke Pines, FL 33023
954-985-8875
caselawrptg@gmail.com

# I N D E X

| THE WITNESS: | PAGE: |
|---|---|
| **ATF SPECIAL AGENT JAVIER PINO** | |
| Cross Examination by Mr. Abrams: | 12 |
| Redirect Examination by Mr. O'Byrne: | 21 |

(Thereupon, the following proceeding was held:)

THE COURTROOM DEPUTY: The United States District Court for the Southern District of Florida is now in session with the Honorable Jonathan Goodman presiding.

THE COURT: Good morning, folks. Please be seated. Make yourselves comfortable.

Folks, I've noticed that some of the defendants on the calendar today have not yet had the *Brady* order issued. So for the benefit of all the prosecutors assigned to those cases and also all the other cases on the don't this morning, I'm going to be reading the *Brady* order, issuing the *Brady* order.

As required by Rule 5(f) of the Rules of Criminal Procedure, the United States is ordered to disclose to the Defendant all exculpatory evidence. That is evidence that favors the Defendant or casts doubt on the United States's case as required by *Brady v. Maryland* and its progeny.

The Government has a duty to disclose any evidence that goes to negating the Defendant's guilt, the credibility of a witness, or that would reduce a potential sentence. The Defendant is entitled to this information without a request.

Not doing so in a timely manner may result in consequences, including, but not limited to exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, disciplinary action or sanctions by the Court.

(Thereupon, the next case was heard:)

THE COURT: Page 8, Johnny Matthew Battle, Jr.; Case 22-cr-20352-Bloom.

Who is here for the United States, please?

MR. O'BRYNE: Good morning, Your Honor. AUSA Hayden O'Bryne on behalf of the United States.

THE COURT: So normally when you speak, Mr. O'Bryne you are telling me that you are standing in for someone. So are you standing in or this is your own matter?

MR. O'BRYNE: I'm my own guy today, Your Honor.

THE COURT: Your own guy? I think there's a famous song by Johnny Cash 'I'm my own guy?' Maybe not.

MR. O'BRYNE: If I could only live up to that standard, Your Honor.

THE COURT: For the Defense.

MR. ABRAMS: I don't think I want to hear him sing.

Good morning, Judge. Stewart Abrams, assistant Public Defender on behalf of Johnny Battle, who is present.

THE COURT: So we are here on a pretrial detention hearing if we have need it and an arraignment. Let's do the arraignment first.

MR. ABRAMS: Your Honor, we have received a copy of the indictment, waive its formal reading and enter a plea of not guilty as to each count that Mr. Battle is charged with. We demand trial by jury and request entry of the Court's

standing discovery order.

THE COURT: Thank you, sir.

The not guilty plea is duly noted. The standing discovery order is either up or soon will be up. The case has been assigned to Judge Bloom. So you will be hearing from her chambers.

Do we have a need for a detention hearing or have you worked something out with the Government?

MR. ABRAMS: May I have a moment, Judge?

THE COURT: Sure take your time.

MR. ABRAMS: Judge, we are not able to resolve it we do need a hearing.

THE COURT: Thank you. So Mr. O'Bryne, just tell me in bullet point fashion, the specific grounds upon which you are seeking pretrial detention.

MR. O'BRYNE: Certainly, Your Honor.

The United States is seeking pretrial detention based on a danger to the community. This Defendant --

THE COURT: Sir, right now I'm not looking for the facts or a speech. I'm just looking for bullet point. For example, danger, risk, presumption. One of those three, some of the three, some combination and that's it. Bullet point.

MR. O'BRYNE: Danger.

THE COURT: Danger.

MR. O'BRYNE: Danger, Your Honor.

THE COURT: Period?

MR. O'BRYNE: Period.

THE COURT: Okay. Factual proffer, please.

MR. O'BRYNE: Your Honor, this Defendant has long been dealing in firearms without a license. According to ATF records this Defendant has purchased over 145 firearms at gun stores in his own name and at least 30 of those have been recovered by law enforcement usually in connection with other criminal investigations.

This Defendant does not have a license to deal in firearms. Based on these firearm purchases, on October 12th of 2021, ATF agents conducted a consensual interview with this Defendant regarding his firearm purchases. The interview was audio and video recorded.

The Defendant advised that he began buying firearms approximately 2013 or 2014 and his purchased approximately fifty and sixty firearms. The Defendant admitted that he sells firearms to people at gun shows, to his friends, and has gifted some firearms to family members for protection.

At the conclusion of the interview, the Defendant was warned about straw purchasing and that it was against the law to deal with firearms without a license. The Defendant claimed he knew the law and was not violating it.

Despite meeting with ATF and being warned verbally not to sell firearms without a license, the Defendant continued

peddling firearms and the firearms that he did peddle kept turning up at crime scenes.

On or about February 4th of 2022, City of Miami Police Officers arrested another individual. Individual one, for running up to his employer and pointing a gun at him over a payment dispute. The firearm was seized by police who traced it and discovered that it had been purchased by this Defendant Johnny Battle.

Individual one suggested that Battle was selling firearms and possibly Glock switches, which are illegal machine gun conversion devices, which converts a semiautomatic Glock pistol into a machine gun.

Under law enforcement supervision individual one made a recorded controlled call to Battle and discussed the purchase of a Glock switch. Subsequently beginning on or about February of 2022, a undercover detective contacted Battle via his cellular phone inquiring about firearms available for purchase.

The UC developed a relationship with Battle where Battle would send the detective photos, prices, and information about firearms for sale.

On or about March 9th of 2022, the CU met with Battle in the parking lot of a gun store. Battle met with an employee of the gun store. The employee came out and left two pistol boxes on a barrier in the parking lot.

Battle picked up the pistol boxes from the barrier and

gave the gun store employee something, possibly money, from his car. He had the CU drive around the corner with him where Battle gave the CU the two boxes, each one containing a firearm.

It did not appear that Battle completed any paperwork when purchasing the firearm and there were no NCI hits or multiple sale reports filed with the ATF as they should have been if this was a regular legal sale on the books from a gun store.

Two days later on March 11th of 2022, two ATF agents went to Battle's apartment and personally served Battle with a written warning.

Your Honor, I have a copy of that warning letter here, which I have marked as Exhibit 1 and I have given a copy to Mr. Abrams. Can I hand a copy up to you?

THE COURT: Yes. Thank you.

MR. O'BRYNE: The ATF agents went to Johnny Battle's house on March 11th of 2022 and gave him a written warning letter, which is captioned at the top: "Warning, notice of unlicensed firearms dealing in violation of federal law."

This letter has been marked as Government's Exhibit Number 1. And at this point I would move it into the record, Your Honor.

MR. ABRAMS: No objection.

THE COURT: Without objection it is so admitted.

MR. O'BRYNE: This letter warned Mr. Battle about his unauthorized and unlicensed dealings with firearms in violation of law. Mr. Battle signed it, acknowledging his receipt of the letter. On March 11th of 2022 and it was witnessed by two ATF agents.

But this warning didn't stop Battle either. On March 23rd of 2022, Battle again met with the CU at the gun store parking lot and sold him another handgun. During this meeting the undercover detective asked about Glock switches.

On May 3rd of 2022, after a number of controlled calls, the CU again met with Battle and Battle sold the CU an AK type rifle from his vehicle. Battle had the CU follow him to a gas station where Battle met with another gun store employee who gave Battle two more firearms to sell to the CU.

Battle and the CU then met up a few blocks from this courthouse where Battle sold the CU a Glock switch. The deal was supposed to be for two Glock switches, but Battle had someone doing counter surveillance who saw one of the ATF surveillance vehicles and you could hear that person call out the vehicle.

Even though they were spooked, Battle only sold one Glock switch to the CU. Since then, Battle has sent photos of additional firearms for sale to the CU. Battle offered to sell a full auto M16 type machine gun to the CU. Battle sent an image depicting the selector switch of the M16.

The selector switch was moved into the auto position indicating that the firearm was a fully automatic machine gun. The selector switch of an ordinary M16 cannot be rotated to that full auto position.

On or about July 7th of 2022, Battle and the CU during another controlled call discussed installing a Glock switch on a Glock pistol. Battle said that he had the tools to do it and the parts might have to be shaved depending on the model of Glock.

Battle also described another fully -- meaning fully automatic firearm that he had for sale. Battle also said that his supplier of switches likely had more, but he was hard to reach.

Last week when Battle was arrested, he was driving in a mobile arsenal. He had approximately ten firearms in his vehicle, including AK-47 and an AR type 15 firearms and five more firearms in his house, including a fully loaded pistol on the nightstand of what period to be his five-year-old daughter's room.

ATF did not find a safe in battle's apartment, nor did they find some of the other firearms that he talked about selling, including the fully automatic AR 15 and 300 blackout (phonetic).

ATF is still inventorying all the firearms and ammunition and related records that were in Battle's apartment.

Battle also, after his arrest, gave a recorded post Miranda interview where he admitted selling the Glock switch to the undercover officer and knowing that it was a machine gun.

Your Honor, that concludes the Government's factual proffer and I have ATF Special Agent Javier Pino available if there is any cross-examination.

THE COURT: Mr. Abrams, would you like the opportunity to examine the witness?

MR. ABRAMS: Yes, sir.

THE COURT: Let's have the agent take the stand, please.

THE COURTROOM DEPUTY: Please raise your right hand.

THE WITNESS: (Complied.)

(Witness sworn.)

THE COURTROOM DEPUTY: Please take a seat and please state your name and spell your last name for the record.

THE WITNESS: Good morning. First name Javier and last name Pino; P-I-N-O.

THE COURTROOM DEPUTY: Thank you, sir.

THE COURT: Mr. Abrams, you may ask questions.

MR. ABRAMS: Thank you, sir.

ATF S/A JAVIER PINO, GOVERNMENT'S WITNESS SWORN

CROSS EXAMINATION

BY MR. ABRAMS:

Q. Good morning, Agent.

A. **Good morning.**
Q. You heard the proffer that was made by the prosecutor regarding the facts of this case?
A. **Yes, sir.**
Q. And would you adopt that as if it was your testimony?
A. **Yes.**
Q. Anything that you would change or correct in regard to what you heard?
A. **No, sir.**
Q. All right. Let me ask you just some questions in regard to the investigation.
One of the points that was made was that Mr. Battle was interviewed in 2021; is that correct?
A. **Yes, that is correct.**
Q. All right. Any question about did Mr. Battle use any false names, or ever disguise his identity as to who he was?
A. **Not to my knowledge.**
Q. All right. And in fact, when he was interviewed I imagine one of the first questions he asked him was his correct name and address; is that right?
A. **I wasn't the one that conducted that interview. That was two other agents. I wasn't present at that interview, but not to my knowledge. He used his name.**
Q. Okay. When I ask you questions and we're not in trial here. So I guess I will ask you and when I ask you some,

either I will ask you if it is based on your personal knowledge or something that you know as a result of talking to others who were involved in the investigation. Is that okay?
A. **Yes, sir.**
Q. All right. So in 2021 Mr. Battle agreed to be interviewed; is that right?
A. **Yes.**
Q. He knew he didn't have to talk to you if he didn't want to?
A. **Correct.**
Q. But, in fact, he did talk to you and he talked to you about his history regarding guns; is that right?
A. **Yes.**
Q. And told you that going back to 2014 he had purchased fifty to sixty guns; is that right?
A. **Yes.**
Q. And he told you that he, as we heard in the proffer, gifted them, he sold them to somebody else, or he sold them at flea markets; is that right?
A. **Yes.**
Q. Now, one of the concerns that was expressed during the proffer was that Mr. Battle was making straw purchases on behalf of others; is that right?
A. **He was making straw purchases. Can you ask that question one more time?**
Q. Okay. He was making straw purchases. Meaning, Mr. Battle,

when Mr. Battle purchased guns Mr. Battle had to do paperwork; is that right?
A. **Yes.**
Q. He had to do the ATF 4473?
A. **Yes.**
Q. And that form contains a question, among many questions -- well, just jumping back. Mr. Battle, if he was a convicted felon he could not lawfully --
A. **Correct.**
Q. -- purchase a gun; is that correct?
A. **Correct.**
Q. And Mr. Battle, to the best of your knowledge, has no prior felony convictions?
A. **Correct.**
Q. So there is no legal impediment to him buying a gun?
A. **Correct.**
Q. There is also a question on the 4473 form that provides are you buying this gun for yourself or for someone else?
A. **Correct.**
Q. And Mr. Battle indicated what on that form?
A. **That he was purchasing the firearms for himself.**
Q. And to the best of your knowledge when Mr. Battle purchased the guns, based on your investigation, do you have reason to believe that when he bought the gun at the time he made the purchase it wasn't his intention to give it to some specific

person?
A. **Based off of what he made on his 4473 on the form that he read to himself, yes. But due to investigations and what we've known with experience and prior, the (inaudible) crimes from individuals purchasing a firearm, for example, a week, seven days or eight days or so from the time he purchased guns, there is an indication that there was some type of a straw purchase that they bought the gun and they turned it over for sale.**
Q. All right. And were other individuals who received these guns arrested and interviewed?
A. **Not as to what I know.**
Q. To the best of your knowledge, has any person who committed an offense with a gun that was purchased by Mr. Battle say I asked Mr. Battle to go into this gun store to buy guns for me because I couldn't have one because I'm a convicted felon?
A. **Not to my knowledge.**
Q. Okay. So as far as we have from a law enforcement perspective, Mr. Battle made lawful purchases of firearms?
A. **He initially did and then turned them over for sale where they ended up in the hands of convicted felons and individuals committing crimes in the community.**
Q. For approximately, what, 150 guns that are attributed to Mr. Battle?
A. **Roughly about 140, give or take.**
Q. And based on your investigation -- and I'm not talking

about what happened to the guns after they were purchased, but is there anything about the purchase that Mr. Battle conducted in regards to any of those 140 guns that was illegal?
A. **No, not at that time. There was nothing that was illegal from those purchases that he made.**
Q. All right. Now, Mr. Battle knew that you, at least as of 2021, you were looking at him; is that correct?
A. **Yes. He was aware that ATF was talking to him in reference to the interview that they had.**
Q. All right. And in fact, you were looking at him; is that right?
A. **Yes.**
Q. You weren't going to tell him that, but you were?
A. **Correct.**
Q. Okay. Based on your investigation, whether it be you or one of the other agents, do you have any reason to believe or -- I shouldn't even say any reason to believe.
I should say reason to know that Mr. Battle, when he made any of the purchases of the guns, he knew that they were going to be used for some nefarious purpose?
A. **Not to my knowledge. It's not a concrete statement that I could say.**
Q. Okay. Now, I know there has been conversation and questions about the Glock switches. Now isn't a Glock switch something that can be bought on line if you know where to look?

A. **I don't know exactly where to buy them. If you know, sir, that would be good, but those are illegal and considered machine guns in the United States. So if you know where to get them, that would be good to pass it on to the ATF.**
Q. I'm asking you. You would know better than me.
A. **I'm an investigator, sir. So if we have to open an investigation.**
Q. All right. You investigate and I ask questions.
A. **Yes, sir.**
Q. Okay. Now, in regard to the purchases, there was one of the transactions that was done behind a gun shop, I believe, it was out back. Do you remember the proffer about that?
A. **Yes.**
Q. There was somebody that was outside and put two guns outside for Mr. Battle to pick up and sell to somebody else?
A. **Yes.**
Q. Now, do you know what preceded that person from the gun shop bringing those two guns outside?
A. **No. Once we viewed the credits from the gun store that we received afterwards we see (inaudible) that's when we noticed that the individual came out and put the two firearms at the barrier right inside the front door of (inaudible) the gun store.**
Q. Do we know if the day before Mr. Battle might have gone into the gun shop and done the paperwork and said I'll be back

tomorrow?
A. **No, we have no knowledge of that.**
Q. But what you do know is that when the person from the gun store brought guns outside there was no paperwork done at that time?
A. **Correct.**
Q. Now, Mr. Battle told you that he kept -- he did keep records? He kept names and addresses of people who he sold guns to; is that right?
A. **Yes, he has mentioned that before.**
Q. Have you seen those records?
A. **There's a few records that we have seen personally through the interview that I had with Mr. Battle where he showed me some of the bill of sales that he had with these individuals.**
Q. Okay. Do any of the records concerning a gun that Mr. Battle is connected with, did he ever misrepresent who he was?
A. **No, he did not.**
Q. Are you aware, based on your investigation which goes back at least -- well, how far back does your investigation go of Mr. Battle?
A. **At least to October of 2021.**
Q. Okay.
A. **But some of the firearms that were recovered start up as early as 2020.**
Q. Are you aware in any of the (inaudible) in terms of your

investigation of Mr. Battle going back as far as when the investigation began, which appears to be at least ten months and perhaps more, of Mr. Battle doing anything himself aggressive with firearms?

A. **Aside from selling a machine gun to an undercover detective and two other individuals, no.**

Q. So Mr. Battle isn't under investigation for shooting up cars in a --

A. **No, just selling a machine gun.**

Q. Okay. By the way, where was Mr. Battle arrested?

A. **At his residence. His apartment.**

Q. And did Mr. Battle know that he was going to be arrested when he got to his apartment?

A. **No, he was coming to talk to us. When he arrived we had him in handcuffs and we (inaudible) after and that's when we had our interview with him.**

Q. I guess my question wasn't particularly artful.

When Mr. Battle returned to his residence -- well, we heard the proffer that there were numerous weapons in his car; is that right?

A. **Yes.**

Q. And when Mr. Battle returned to his residence, he knew that even if he didn't know he was going to be arrested, he knew that agents were going to be there; is that right?

A. **That is correct, yes.**

Q. And that follows him having had at least two conversations with agents; the first time with the interview and the second time receiving the firearms warning about his dealings with guns; is that right?
A. **Yes.**
Q. And despite that he still voluntarily came to his apartment knowing that law enforcement was going to be there?
A. **Yes.**
MR. ABRAMS: Thank you. I have nothing further Judge.
THE COURT: Mr. O'Bryne, do you have anything further that you would like to bring out through this agent?
MR. O'BRYNE: Yes, just a few points of clarification.

REDIRECT EXAMINATION

BY MR. O'BRYNE:
Q. Agent Pino, individual one was arrested on state charges, correct?
A. **Yes.**
Q. All right. And that gun was recovered as part of that state investigation?
A. **Yes.**
Q. All right. Have you reviewed the recordings of the UC going into the gun store, the records of the UC outside the gun store?
A. **Yes, I have.**
Q. Okay.

and during that did the UC tell Mr. Battle that he could not get guns inside a gun store because they would make him do paperwork?
A. **Yes. There was a previous talk about that as well where they had communicated that he needed it off record.**
Q. Okay. And did the UC also talking about exporting guns?
A. **Yes. He said that he takes them over to Haiti?**
Q. In your experience you have investigated straw purchase cases before, haven't you?
A. **Yes.**
Q. Now, generally in a straw purchase case, does the purchaser tell the seller of the firearms why they want the guns or what crimes they're going to be committing with the guns?
A. **No, they don't specifically. They'll just say that they can't acquire a firearm legally. So that's all they tell the purchaser.**
Q. I also talked to you about the two guns that were purchased at the gun store. Those were handguns, correct?
A. **Yes.**
Q. Now, if those two handguns were purchased legally at a gun store and all the rules were followed, would the gun store still have to file a multiple sale report?
A. **Yes.**
Q. And would that be reported to the ATF?
A. **That would be reported, yes.**

Q. And would that information come to you as the case agent?
A. **Yes, it would come -- currently those forms they're not B -- they're on a hold to be chased to find out the original purchaser due the ongoing investigation that we had on Mr. Battle.**
Q. All right?

MR. O'BRYNE: All right. Thank you, Your Honor. I do not have any further questions, but I do have argument?

THE COURT: Thank you, sir. You may step down.

Before you get to argument, Mr. O'Bryne, let me just can you, under the Advisory Sentencing Guidelines, if Mr. Battle were to go to trial on the existing indictment and he were to get convicted, what would he be facing under the advisory guidelines after you factor in all the appropriate elements, criminal history, et cetera? What would he be confronted with?

MR. O'BRYNE: Yes, sir.

With the enhancement for the 140 plus firearms, he's facing a guideline sentence of 151 to 188 months.

THE COURT: I'm happy to listen to your argument.

MR. O'BRYNE: Your Honor, this Defendant is a danger to the community. While he might have pointed a gun at anybody or shot anybody , he is the one that is putting the gun in the hands of those that do.

There's 140 firearms that he has purchased. Many of

those went to criminals. At least 30 that we have recovered so far. And even though he was warned about this twice, he continued selling guns to the undercover detective. Even not detective said he couldn't buy guns in a gun store, he still sold him the guns.

And even after that second warning and him knowing that ATF was investigating him and ATF warning him twice not to do it. He not just sold guns, he sold a machine gun to an undercover detective.

No matter what this Defendant is told, he will still keep selling guns, including machine guns. He has been warned repeatedly at least twice not to sell guns and he keeps doing it.

And because of that, Your Honor, there is no set of circumstances or conditions that this court can fashion and there is nothing that this Court can tell this Defendant that will make him stop selling guns to criminals.

This happened repeatedly despite the warns and he just keeps doing it.

So for those reasons, Your Honor, the United States believes that this Defendant is a serious danger to the community and we would ask that he be detained pretrial.

THE COURT: So I'm just curious because I heard you say the words a serious danger to the community. Is that a term of art? Are you quoting from the Bail Reform Act a

serious danger because I am not familiar with that phrase, or is that sort of an edit to recall adjective by you?

MR. O'BRYNE: Editorial, Your Honor.

THE COURT: All right because I'm saying to myself, oh, my God, /SREUB miss reading the bail reform act for the past twelve years? All right. That's you just making an argument.

MR. O'BRYNE: Yes, Your Honor.

THE COURT: All right. You could have said he's a major danger or a big time danger. You just used the word serious danger.

Thank you so much.

Mr. Abrams?

MR. ABRAMS: /KWR-S, Judge. One of the things that strikes me when the Government says that there is nothing that can be done by the Court or nothing that can be said by the Court to cause Mr. Battle to not sell guns anymore. There actually is something which is very significant and very substantial in Mr. Battle's life. And that is that now he has been arrested, he has been arrested and he has been fingerprinted and he has been processed and he has been paraded into a courtroom. He has never had that experience before. Unlike many people who we have dealt with in the past who are charged before the Court in gun cases.

In this case he was under investigation for

approximately one year. And during that time, he candidly admitted that he had purchased guns. He said that he purchased guns going back to 2014.

Mr. Battle was such a danger it seems that it took eight years to bring him here and if Mr. Battle personally was going to do something with guns that constitute a danger to the community, it certainly would have happened during that time.

We have heard and asked questions about straw purchases. We don't anything which indicates that Mr. Battle, when he purchased a gun and he purchased a gun in his name and ultimately gave it or sold it to somebody else, which he did mostly in flea markets, that Mr. Battle made that purchase with the understanding that the other person was going to do something evil with that gun. And Mr. Battle was not charged with making straw purchases. That's not what he is charged with. He's charged with the machine gun.

I take issue with the Government's representation regarding the guidelines because a big jump in the guidelines has to do with him knowing that he is selling to a prohibited person which we don't have evidence before this Court to that effect.

As to the number of weapons which are involved in the offense because the majority of those 140 weapons are in the illegal. The offense in this case is the machine gun and a machine gun switch and that is going to make a significant

difference in what the potential guidelines in this case are.

Aside from that, Judge, you have a life time member of the South Florida community. There are many family and friends present in court today, including Mr. Battle's mother Melody pierce who is present with her husband, Mr. Battle's stepfather Willie pierce who live in Miami.

Miss pierce has been here her entire life. The pretrial services report references her and her wok as a librarian. She is only working part-time now and I would point out now that unfortunately miss pierce is dealing with cancer and she is undergoing chemotherapy form which she was depend enter on or was going to be dependent on Mr. Battle taking her to those appointments.

Mr. Pierce owns a home that he inherited. I believe he has had the home for 40 or 50 years.

THE COURT: When you say Mr. Pierce, you mean Willie pierce?

MR. ABRAMS: Willie pierce.

THE COURT: The stepfather?

MR. ABRAMS: The stepfather.

THE COURT: All right. And is he here this morning?

MR. ABRAMS: Mr. Pierce is here this morning.

THE COURT: And is his mother here, Melody?

MR. ABRAMS: Melody pierce is here as well.

THE COURT: Okay.

MR. ABRAMS: And Judge, the bond we are going to suggest -- and he also has a sister, LaCretia Wimberly (phonetic), who is not here today. Miss Wimberly resides in Georgia. She is a former corrections officer. She is a psychologist and social worker. She very proudly pointed out to me with two master degrees who is prepared to also co-sign a bond on Mr. Battle's behalf.

The bond that I would suggest to Your Honor --

THE COURT: Excuse me, Miss Wimberly who you just mentioned to me, the two master degree holder in Georgia, does she own real estate?

MR. ABRAMS: No, sir.

THE COURT: Okay. Please continue.

MR. ABRAMS: The bond that I would suggest to Your Honor and the ability to take care of the financial obligation comes both from the family and the many friends who are presented to would be a 50,000, ten percent bond, coupled with a 100,000 personal surety bond all bonds co-signed by Melody pierce, Willie pierce, and we can add Miss Wimberly if Your Honor would like that assurance as well. Although I said she is not a property owner. We have no objection to GPS monitoring and a curfew.

Mr. Battle does work security. He has two security jobs. He has his own business and he works for a company as well. He has done armed security. However, he also can do

unarmed security and we anticipate that there will be a prohibition about his possessing or doing anything with firearms and we fine with that.

We would just ask that if Your Honor would adopt this bond, that the probation office or Pretrial Services have the discretion to set the curfew and the conditions so that they can work around his work schedule. Sometimes he works overnight. Sometimes he works morning to late afternoon.

On certain days when he is working for his employer and he is self-employed, when I think it is two days a week, he does two different security jobs, but that's only one or two days a week.

So our suggestion again is a 50,000 ten percent, 100,000 personal co-signed by Melody pierce, Willie pierce, and the sister if Your Honor wants that third co-signor.

THE COURT: Let me ask you a followup question, Mr. Abrams. So your client has two jobs; one is he works as an armed security guard for Cambridge Security.

MR. ABRAMS: Yes, sir.

THE COURT: And you say no worries, Judge, he can work an unarmed position. My understanding about that business is that it costs more for an armed guard than an unarmed guard. So perhaps his salary would decrease if he was not working as an armed guard.

But setting that potential consequence aside, the

second job that he has, his own company called Battle's protection LLC where he works as a bodyguard for private clients. Does he typically carry a firearm or firearms with him when he is working as a bodyguard?

MR. ABRAMS: He does when he is doing his bodyguard duty, but as he advises, he has clubs and jobs that he works where he can work unarmed. Judge, if it is a job that involved something where he had to have a firearm, he can't do it. It's as simple as that he can't take that job. And Pretrial Services doesn't approve him to be out for that purpose.

THE COURT: I don't mean to be a wise guy with his comment and I don't know all the ins and outs of the bodyguard business, but it seems to me that it would be a challenge to be a, effective bodyguard for a private client if you are not permitted to carry a firearm. You would be sort of automatically disadvantaged as a bodyguard without that, don't you think?

MR. ABRAMS: If he is working as a bodyguard, but he doesn't necessarily have to do the bodyguard jobs.

THE COURT: So I would like to spend a little time talking to your client's mother, Melody, and also to Mr. Pierce, Willie pierce. So, folks, if the two of you can come to the lectern. Mr. Battle, with the help of the Marshal, move to the side, please.

Good morning, folks.

MS. PIERCE: Good morning, sir.

MR. PIERCE: Good morning.

THE COURT: Betty, can you swear in both of these witnesses, please.

THE COURTROOM DEPUTY: Of course, Judge.

(Witnesses sworn.)

THE COURTROOM DEPUTY: Can I have your names and spell your last name for the record, please. Melody. My name is Melody Pierce; P-I-E-R-C-E.

THE COURT: And the first name, ma'am, how do you spell it?

MS. PIERCE: M-E-L-O-D-Y.

THE COURT: Thank you.

MR. PIERCE: Willie Pierce; W-I-L-L-I-E P-I-E-R-C-E.

THE COURTROOM DEPUTY: Thank you.

THE COURT: All right. So first I will ask some questions to Miss Pierce.

Ma'am, tell me your date of birth, please?

MS. PIERCE: September the 7th, 1967.

THE COURT: And you are the Defendant's mother?

MS. PIERCE: Yes, I am, sir.

THE COURT: Do you work?

MS. PIERCE: Yes, I do. I've been working --

THE COURT: What kind of work do you do, please?

MS. PIERCE: I work at the library on Miami Beach on

22nd and Collins. I have haven't been working the last few weeks or so because I just started chemotherapy last week, Thursday.

THE COURT: So that's the public library on Miami Beach?

MS. PIERCE: Yes, Miami-Dade County.

THE COURT: All right. And do you have any kind of criminal history at all?

MS. PIERCE: No, sir.

THE COURT: Do you own your own home?

MS. PIERCE: Yes, we do.

THE COURT: That's in Lauderhill?

MS. PIERCE: No, it's in Dade County, Miami-Dade County.

THE COURT: Miami-Dade County?

MS. PIERCE: Yes, sir.

THE COURT: If I ask you how much equity you have in the home, do you know what I'm asking you for?

MS. PIERCE: It's 350,000.

THE COURT: That's the equity that you have in the home?

MS. PIERCE: Yes.

THE COURT: How many bedrooms?

MS. PIERCE: Two, sir.

THE COURT: Are you aware of the potential

consequences arising from being a co-signer on a bond and if you are not, no worries. I will be happy to give you a quick explanation.

MS. PIERCE: Yes, we are aware. Mr. Stewart explained everything.

THE COURT: Mr. O'Bryne, are there any questions you would like to ask Miss Pierce?

MR. O'BRYNE: Miss Pierce, do you have any firearms in your home.

MS. PIERCE: No, sir.

MR. O'BRYNE: Do you have any other children that live in the South Florida area that have firearms?

MS. PIERCE: No, sir.

MR. O'BRYNE: Okay. Who does Mr. Battle reside with?

MS. PIERCE: He lives in his own apartment in Lauderhill.

MR. O'BRYNE: Does anyone live with him?

MS. PIERCE: His five-year-old daughter.

MR. O'BRYNE: Anyone else?

MS. PIERCE: And is god-brother Anthony.

MR. O'BRYNE: Does his god-brother Anthony -- is that his first name?

MS. PIERCE: Yes, he's here. He's right there, sir, in the back to the left.

MR. O'BRYNE: To your knowledge, does Anthony have any

firearms?

MS. PIERCE: Not to my knowledge.

MR. O'BRYNE: Do any of your family members have any security of businesses or firearms businesses with Johnny Battle?

MS. PIERCE: No, sir.

MR. O'BRYNE: Do you know if any of them intended to have any security or --

MS. PIERCE: Not to my knowledge, sir.

MR. O'BRYNE: Let me just finish the question so it is clear for the record.

MS. PIERCE: Okay.

MR. O'BRYNE: To your knowledge, do any family members have they intended to have any security or firearms businesses with Johnny Battle?

MS. PIERCE: To my knowledge, sir.

MR. O'BRYNE: Before last week did you know that Mr. Battle had firearms?

MS. PIERCE: Not to my knowledge. Only the ones that he works with due to the he does armed security.

MR. O'BRYNE: Do you know of Mr. Battle getting in any fights?

MS. PIERCE: Not to my knowledge, sir.

MR. O'BRYNE: Do you know if Mr. Battle has any history of mental health issues?

MS. PIERCE: Not to my knowledge.
THE COURT: Can you keep your voice up a little bit and speak into the microphone.
MS. PIERCE: Not to my knowledge.
THE COURT: Because you seem to be having a private conversation and I can't hear what's going on.
MR. O'BRYNE: Do you know if Mr. Battle has any issues with substance abuse or dug use?
MS. PIERCE: Not to my knowledge, sir.
MR. O'BRYNE: Prior to last week how often would you regularly see Mr. Battle?
MS. PIERCE: On a daily basis due to, like I said, I'm going through chemotherapy for cancer and I just had spine surgery of last year, November, so he often visits me.
MR. O'BRYNE: No further questions, Your Honor.
THE COURT: Thank you.
Mr. Pierce --
MR. PIERCE: Yes, sir.
THE COURT: -- tell me your date of birth, please.
MR. PIERCE: 8/26/62.
THE COURT: Do you work?
MR. PIERCE: I'm on disability.
THE COURT: Do you have any kind of criminal record?
MR. PIERCE: My past. I was locked up in 1989 for --
THE COURT: Tell me a little bit more about that.

MR. PIERCE: For trafficking.
THE COURT: Drug trafficking?
MR. PIERCE: Yes.
THE COURT: Okay. State or federal?
MR. PIERCE: State.
THE COURT: And this was in 1989?
MR. PIERCE: Yes, sir.
THE COURT: How much time did you --
MR. PIERCE: In the State of Georgia.
THE COURT: I'm sorry, sir?
MR. PIERCE: In the state of George.
THE COURT: All right. And how much time have you served?
MR. PIERCE: Five years.
THE COURT: Have you had your civil rights restored?
MR. PIERCE: No, sir.
THE COURT: So you are not allowed to possess a firearm yourself?
MR. PIERCE: Not at all. (Inaudible).
THE COURT: Did the state conviction in Georgia have anything to do with firearms or was it limited to drugs?
MR. PIERCE: Just drugs.
THE COURT: So you were released in 1994?
MR. PIERCE: Yes, sir.
THE COURT: When you were released did you have any

kind of supervised release following your release from the actual institution?

MR. PIERCE: Yes, sir. I was released to the State of Florida and came back home due to my father.

THE COURT: I'm sorry, sir?

MR. PIERCE: I came back to get released to the State of Florida due to my father had cancer. So I came back home and I rereleased and I'm still on paper right now to (inaudible).

THE COURT: So you're still under supervised release?

MR. PIERCE: Yes, I will be finished next year.

THE COURT: All right. So who is doing the supervision?

MR. PIERCE: The state.

THE COURT: The state of?

MR. PIERCE: Florida.

THE COURT: So the State of Florida is doing the supervision for Georgia?

MR. PIERCE: Yes.

THE COURT: And that supervision ends next year?

MR. PIERCE: Yes, sir. As a matter of fact January.

THE COURT: In the past five years has there been any alleged violation --

MR. PIERCE: No, sir.

THE COURT: Of your supervised release?

MR. PIERCE: No, sir.

THE COURT: Did you get sent to state prison in Georgia as a result of a plea of guilty or a plea of nolo contendere --

MR. PIERCE: I pleaded guilty, sir.

THE COURT: You pleaded guilty?

MR. PIERCE: Uh-huh.

THE COURT: Okay. So it was not a trial. You just admitted your guilt?

MR. PIERCE: Yes, sir.

THE COURT: And you are willing to be a co-signor on a bond?

MR. PIERCE: Yes, sir. Yes.

THE COURT: Are you one of the record title owners of the home?

MR. PIERCE: Yes, sir.

THE COURT: So you and your wife are on the home jointly?

MR. PIERCE: Yes, sir.

THE COURT: Mr. O'Bryne, do you have any questions for Mr. Pierce?

MR. O'BRYNE: Just to clarify. That home is the one you jointly own with miss Melody pierce, correct?

MR. PIERCE: Yes, sir.

MR. O'BRYNE: How long have you known the Defendant

Johnny Battle?

MR. PIERCE: Since he was six years old.

MR. O'BRYNE: And during that time have you known Mr. Battle to get in any fights?

MR. PIERCE: No, sir.

THE COURT: Have you known him to have any problems with drugs or alcohol?

MR. PIERCE: No, sir.

THE COURT: Have you known him to have any history of mental health issues?

MR. PIERCE: No, sir.

THE COURT: Have you known that Mr. Battle has firearms?

MR. PIERCE: No, I didn't. I'm very surprised.

MR. O'BRYNE: Under the terms of your supervision with the State of Florida, is there any curfew or geographic restrictions on where you can go?

MR. PIERCE: No, sir.

MR. O'BRYNE: At this point is it just reporting or are --

MR. PIERCE: Yes, sir. Uh-huh.

MR. O'BRYNE: -- any other restrictions?

MR. PIERCE: Yes. Uh-huh.

MR. O'BRYNE: No further questions, Your Honor.

MR. PIERCE: Can I speak for my family?

THE COURT: Sir, you and your wife can sit down.

But I do want the opportunity to speak with Mr. Anthony Andrews who Mr. Battle lives with. So Mr. Andrews, can you come up, please, sir?

THE COURT: Good morning, sir.

THE WITNESS: Good morning.

THE COURTROOM DEPUTY: Please raise your right hand.

THE WITNESS: (Complied.)

(Witness sworn.)

THE COURTROOM DEPUTY: Please state your name and spell your name for the record.

THE WITNESS: My name is Anthony Lee Andrews junior.

THE COURTROOM DEPUTY: Can you spell your last name for the record?

THE WITNESS: A-N-D-R-E-W-S.

THE COURTROOM DEPUTY: Thank you.

THE COURT: Mr. Andrews, give me your date of birth, please.

THE WITNESS: March 14, 1991.

THE COURT: What is your relationship to Mr. Battle?

THE WITNESS: He's by God brother.

THE COURT: And the two of you live together in the same residence?

THE WITNESS: Yes, sir.

THE COURT: And where is that?

THE WITNESS: In Fort Lauderdale.
THE COURT: Is it a house or an apartment?
THE WITNESS: An apartment.
THE COURT: In what city?
THE WITNESS: Lauderhill, Florida.
THE COURT: Do you own it or rent it?
THE WITNESS: Rent it.
THE COURT: Do each of you have your own bedroom?
THE WITNESS: Yes.
THE COURT: Do you work?
THE WITNESS: Yes, sir.
THE COURT: What kind of work do you do?
THE WITNESS: I do security.
THE COURT: For what company?
THE WITNESS: Battle Protection.
THE COURT: Oh, you work for your god-brother?
THE WITNESS: Yes.
THE COURT: Do you ever do armed security for Battle Protection?
THE WITNESS: Yes, I do.
THE COURT: Do you have any kind of firearm licenses; for example, like a concealed carrying permit?
THE WITNESS: Yes.
THE COURT: Tell me about the licenses that you have.
THE WITNESS: I have my D and G.

THE COURT: D and G?

THE WITNESS: Yes.

THE COURT: Tell me what that means.

THE WITNESS: Well, D is to do unarmed and /TKPW-FRPLT is to do armed secured.

THE COURT: All right. So that's a license to be a security guard?

THE WITNESS: Yes.

THE COURT: All right. So in addition to being a licensed security guard in Florida, do you also have a permit to carry a concealed weapon?

THE WITNESS: No, I don't have no permit.

THE COURT: All right. And so when you do armed security guard work, do you use your own firearm?

THE WITNESS: No, sir.

THE COURT: Who provides you with a firearm when you do firearm type work?

THE WITNESS: The business. The job -- well, the company.

THE COURT: The company meaning Battle Security?

THE WITNESS: Yes.

THE COURT: Do you have any firearms in the apartment that you live in with Mr. Battle?

THE WITNESS: No, sir.

THE COURT: Do you have any kind of criminal record?

THE WITNESS: No, sir.
THE COURT: Are you willing to be a co-signor on the bond?
THE WITNESS: Yes, sir. If I have to be, yes, sir.
THE COURT: Well, before you say yes, are you familiar with all of the potential consequences of being a co-signor? And if you are not sure I will give you a quick 45-minute explanation.
THE WITNESS: No, I'm not sure.
THE COURT: All right. So when you are a co-signor on a bond, you basically put yourself at financial risk if the Defendant, in this case Mr. Battle, becomes a fugitive, or flees, or takes off, or otherwise violates the conditions of the bond. If the Defendant complies with the conditions of the bond and shows up for court as required, no consequences to you or to any of the other co-signors. The bond gets discharged. It's as if it never existed. But if Mr. Battle takes off, or violates the conditions of the bond, then you and the other co-signors are on the hook financially.
So, hypothetically, if the amount of the bond is let's say $200,000, whether you have that much money or not, you would be on the hook for $200,000 and the Government could get a judgment against you for $200,000 and they could spend years and years trying to collect that money from you.
Even though you may not have done anything wrong, even

though you are not accused of a crime, and even though no one has accused you of doing anything remotely wrong, it is simply that you decided to become a co-signor and unfortunately for you, you are now financially on the hook.

So that's the basic explanation of what it means to be a co-signor. Are you willing to be a co-signor?

THE WITNESS: Yes, sir.

THE COURT: Mr. O'Bryne, do you have any questions for Mr. Andrews?

MR. O'BRYNE: Yes, sir.

I just want to clarify. Of the apartment in Lauderhill that you reside at with Mr. Battle, do you own any of the firearms in that apartment?

THE WITNESS: No, sir.

MR. O'BRYNE: Do you own any firearms?

THE WITNESS: No, sir.

MR. O'BRYNE: You said earlier that you got firearms from Battle Protection. What sort of firearms have you been provided by Battle Protection?

THE WITNESS: Just firearm, a Glock 40 -- Glock 23. I'm sorry.

MR. O'BRYNE: Have you ever been provided with AR or AK type firearms by Battle Protection?

THE WITNESS: No, sir.

MR. O'BRYNE: And when you do security work for Battle

Protection, do you do that with Johnny Battle?

THE WITNESS: Yes, sometimes.

MR. O'BRYNE: And is that like personal bodyguard work where you go around with people?

THE WITNESS: Yes, sir.

MR. O'BRYNE: Do you know what firearms Battle Protection owns?

THE WITNESS: No, sir.

MR. O'BRYNE: Are you aware of there being firearms in the apartment that you live at with Johnny Battle?

THE WITNESS: No, sir.

MR. O'BRYNE: When you get a firearm from Battle Protection to do your work, how is that firearm given to you?

THE WITNESS: It is usually given to me before my shift. Like as soon as we get to the location and as soon as we are about to work, that is when I'm given my firearm.

MR. O'BRYNE: And does Johnny Battle give you your firearm?

THE WITNESS: Yes, sir.

MR. O'BRYNE: And how often does that happen on a monthly basis?

THE WITNESS: It depends on the (inaudible) that we have.

MR. O'BRYNE: Have you ever seen Johnny Battle give a firearm to anyone else?

THE WITNESS: Saw him with the company. The company, yes.

MR. O'BRYNE: And who are those people?

THE WITNESS: Co-workers.

MR. O'BRYNE: Do you know their names?

THE WITNESS: I know a couple. I don't know their names right now, but I know a couple of them.

MR. O'BRYNE: Just to be clear, at this moment, you don't know the names of any co-workers that Mr. Battle has given guns to?

THE WITNESS: It's not like me, I'm more like -- I stay to myself. That's all that it is, but I know the co-workers that I work with. I know their names.

MR. O'BRYNE: Can you please tell us the names of the co-workers that you have seen Johnny Battle give guns to.

THE WITNESS: I only know them by first names. I can't tell you their last names. Can I say first names?

THE COURT: Sure. Just give the best answer that you are able to.

THE WITNESS: Steven who is here with us today. I know another guy. His name is Mark. He also has his own security company as well.

MR. O'BRYNE: Is there anyone else?

THE WITNESS: Those are the only two that I have worked with.

MR. O'BRYNE: Okay. Does Battle Security have an office anywhere?
THE WITNESS: No, sir.
MR. O'BRYNE: Have you ever known the Defendant Johnny Battle to have any issues with drugs or alcohol?
THE WITNESS: No, sir.
MR. O'BRYNE: Have you ever known the Defendant Johnny Battle to have any mental health issues?
THE WITNESS: No, sir.
MR. O'BRYNE: Have you ever known the Defendant Johnny Battle to get into any fights?
THE WITNESS: No, sir.
MR. O'BRYNE: When you have worked as a security guard with Johnny Battle, has he ever laid hands on anyone?
THE WITNESS: No, sir.
MR. O'BRYNE: You live with Johnny Battle at the apartment in Lauderhill, correct?
THE WITNESS: Yes.
MR. O'BRYNE: Do you both sleep there every night or do you have other residences?
THE WITNESS: We sleep there every night.
MR. O'BRYNE: Thank you. No further questions.
THE COURT: Mr. Andrews, I just had a followup question. Do you have any military service in your background?
THE WITNESS: No, sir.

THE COURT: Thank you so much. You may take your seat.

THE WITNESS: Thank you.

THE COURT: Thank you for your presentations. Here is my ruling.

I'm going to did not Government's request for a pretrial detention because I find that there are, in fact, a combination of conditions which would assure the safety of the community.

However, there is going to be a multifaceted bond with many conditions so I am going to outline all of them now.

First, this will be a $75,000, ten percent bond with a *Nebbia* condition and Mr. Abrams, I have a *Nebbia* form here on a desk in front of the bench in which you can use.

MR. ABRAMS: Yes, sir.

THE COURT: It is designed to avoid my need to examine bank records, real estate records, deeds, et cetera. So basically, you will fill out that form and present it to Mr. O'Bryne with the appropriate background materials. Hopefully he will agree that you have met the *Nebbia* requirement. And if you have, then you simply present it to me for my countersignature. There's a little blank line where you fill out in one sentence or so the source of the money used to meet the *Nebbia* requirement.

In addition, there will be a $200,000 personal surety

bond. That bond will be co-signed by the Defendant's mother Melody. It will also be co-signed by the Defendant's stepfather Willie Pierce. It will also be co-signed by the Defendant's sister LaCretia Wimberly and it will also be co-signed by the Defendant's god-brother, Anthony Lee Andrews junior.

I don't know, Mr. Abrams, when you are going to be getting the paperwork in, but I understand that Miss Wimberly is in Georgia. So I don't want to hold up the relief just because you couldn't logistically get a signature from Georgia.

So hypothetically today is Wednesday. Let's say Friday you meet the *Nebbia* condition, I will give you an additional three days until Wednesday of next week to turn in the signature page from Miss Wimberly in Georgia. So that administrative requirement doesn't get in the way of your client being released if the other conditions have been met.

In addition, the Defendant is going to need to report to Pretrial Services as directed. So he will need to surrender his passports and travel documents. He may not seek or apply for any additional passports or travel documents.

He will need to undergo substance abuse testing and/or treatment.

Next, and this is critical, the Defendant may not possess a firearm, destructive device, or dangerous weapon. Nor may he possess ammunition or any type of devices that can

be used to convert a weapon into an automatic weapon.

When I say that the Defendant cannot possess a firearm, I also mean any other entity, sir, that you are connected with. So if you have a company called Battle Security, whether it is a corporation, a LLC, a partnership, or just doing business understand that name, you will not be able to possess a firearm, ammunition, dangerous device, or any item that can be used to convert a weapon into an automatic weapon.

So just so we're clear, this prohibition applies to every single aspect of your life. Do you understand what I'm saying?

THE DEFENDANT: Yes, sir.

THE COURT: Likewise, you will not be able to work in any job where you are possessing or using a firearm or ammunition. So you will not be able to work as an armed security guard. You will not be able to give weapons to other people who work for Battle Security, like we heard from Mr. Andrews.

THE DEFENDANT: Yes, sir.

THE COURT: Because you are not to possess any firearms to give to him in the first place. You are going to need to surrender any kind of weapons permit to Pretrial Services.

Do you have any type of firearms related permit?

THE DEFENDANT: They already have them.

THE COURT: Who is they? The ATF agent has --

THE DEFENDANT: Yes.

THE COURT: -- the permit?

What type of permit?

THE DEFENDANT: He have the D and G and my conceals and he has my driver's license.

THE COURT: So that was taken from you at the time of your arrest?

THE DEFENDANT: Yes, sir.

THE COURT: I don't know if a driver's license is considered a firearms related license, but the others are.

In addition, you will need to reside at the same residence in Lauderhill. You will be on a curfew and I am going to give Pretrial Services the discretion to pinpoint the hours of the curfew.

THE DEFENDANT: Okay.

THE COURT: But generally it will be the type of curfew that will enable you to work of what would be considered normal business hours.

THE DEFENDANT: Okay.

THE COURT: And I'm also going to leave it up to Pretrial Services to determine what type of technology to use in order to enforce that curfew. So it will be generally electronic monitoring that Pretrial Services will determine what type to use and your payment will be based on your ability

to pay.

In addition, any of the co-signors who own any real property will not be able to sell, transfer, convey, or do anything at all to effect the title to any real estate that they own. So, therefore, your parents will not be able to do anything at all to effect the title to the real estate, to the home that they own, because that home is collateral for the bond.

In addition, you will need to submit yourself your property, your car, your residence, computers, phones, electronic communications, data storage devices to a search to be conducted by a United States probation officer.

In other words, Pretrial Services, which is part of the probation department, can conduct a surprise search at any time. Not just of you or your car, but of your apartment. So Mr. Andrews will also, if he has anything in that apartment, that may be subject to a surprise search. The search must be conducted at a reasonable time and in a reasonable manner, but probation certainly doesn't have to give you advance notice that they are conducting a search. That would be somewhat several defeating.

Are there any other additional special conditions suggested, Mr. O'Bryne, by the U.S. attorneys office?

MR. O'BRYNE: One thing I didn't hear is whether or not there can be any firearms in the residence.

THE COURT: No. No firearms in the residence. No ammunition. No devices that can be used to convert a weapon. No dangerous devices. All of that off limits. I thought I made that clear, but thank you for flagging that. Yes, sir.

Any other special conditions suggested by the U.S. attorneys office?

MR. O'BRYNE: Nothing further, Your Honor.

THE COURT: Any other additional special conditions suggested by Pretrial Services?

U.S. PROBATION: Good morning, Your Honor.

Herald (inaudible) for Probation. Your Honor, if we could actually set the curfew and enter it in the record for 10:00 p.m. to 6:00 p.m.? Sure.

THE COURT: So the curfew will be from 10:00 p.m. to 6:00 a.m. That means, sir, that you will need to be in your apartment from 10:00 p.m. so 6:00 a.m.

THE DEFENDANT: Yes.

THE COURT: And to the extent that you are working, it will have to be on shifts that enable you to be home during those hours.

So it doesn't sound you are going to be able to work a night shift because you are going to be home.

THE DEFENDANT: Yes.

THE COURT: I want to make sure that you understand exactly what the curfew means. For those hours that you need

to be home, 10:00 p.m. to 6:00 a.m., that means you have to be there in your apartment. And if you are not, you are in violation of the bond and the Government can revoke the bond and all other co-signors and all your family members then will be on the financial hook up to $200,000.

So let's say you get relief two weeks from now on a Saturday night at 10:45 at night, your next door neighbor in the apartment next door knocks on your door and says, hey, Johnny, I'm having a couple of people over here for some late night food. Do you want to join us? You can't go. Even though it is only 50 feet away next door. If you leave your apartment after 10:00 p.m. to go to the apartment next door, you are breaking your curfew.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Anything else from Pretrial Services?

U.S. PROBATION: No, Your Honor. Thank you.

THE COURT: All right. Have we established, Betty, the -- oh, you know what, Mr. Abrams. I can't remember. I think we already did the arraignment at the very beginning.

THE COURTROOM DEPUTY: Yes, you did.

THE COURT: 45 minutes ago.

All right. Fair enough. Anything further from either side this morning concerning Johnny Matthew Battle, Jr.?

MR. O'BRYNE: Yes, Your Honor.

Two matters. One is the United States would move to stay the release pending appeal of the bond decision to the District Court.

The other issue is I have two motions to unseal the search warrants. I made an ore tenus motion at the initial appearance and provided those search warrants to Mr. Abrams upon it being granted. I noticed the CM-ECF notice from Friday was off by one digit, but as of yesterday, neither search warrant had been unsealed, but I would like to hand out motions and orders to unseal the search warrants.

THE COURT: So let's take it a step at a time.

Step number one I will grant your request for an automatic stay of this decision. However, you will need to order the transcript on an expedited basis. You will need to file your appropriate challenge, your motion, by next Tuesday.

The reason I say that, sir, is I have had experience, unfortunate experiences over the years where the Government will ask me for an automatic stay, which I graciously provide that courtesy. And then, weeks go by before they even file the actual substantive paperwork.

So, in effect, there is like a *de facto* stay of many, many weeks and I just don't think that's what the Bail Reform Act is meant and I don't think the automatic stay is designed for that.

So, yes, I will stay my ruling, but you need to order the transcript as quickly as you can. You will have to file it because Judge Bloom is going to need to review the transcript in order to understand the basis of my ruling and then you will need to file your motion by the deadline.

Clear?

MR. O'BRYNE: Understood, Your Honor.

THE COURT: Okay. After we are done this morning, you can come up and hand up those motions to unseal. And is there a line there for me to sign it?

MR. O'BRYNE: Yes, Your Honor.

THE COURT: Actually, you can bring it up now.

THE COURTROOM DEPUTY: I just want to make clear that you are staying the bond until July 23rd?

THE COURT: I don't think July 23rd because we're already in August.

THE COURTROOM DEPUTY: I meant August.

THE COURT: So August 23rd is --

THE COURTROOM DEPUTY: A Tuesday.

THE COURT: That's right. So I'm staying it until next Tuesday and the Government has to file their -- well, I'm staying it until Tuesday unless the Government files its motion by Tuesday.

Because once the Government files its motion, then the stay will remain. Mr. Abrams will file his response and then

the Judge will rule; Judge Bloom will rule. I don't know how long that will take, but the stay will remain in effect once the appellate challenge is percolating away.

Okay. It's not like suddenly on the 23rd the stay disappears. It will remain assuming the Government timely files. So, Mr. O'Bryne, bear with me a minute, please. Well, there is actually a blank line here, sir, on Page 2 for your signature and it is not there.

MR. O'BRYNE: Let me see it, Your Honor.

THE COURT: I'm going to hand them back to you for a minute. There's a second page there, Mr. O'Byrne, for you to sign and then sign them and hand them back, please.

MR. O'BRYNE: I'm signing.

THE COURT: And then, the third page is for my signature. Today is the 17th. It just seems like the 18th.

All right, folks, anything else this morning concerning Mr. Battle?

MR. ABRAMS: Judge, I would ask that I know you have set a curfew, but should it become appropriate to revisit that curfew, I would ask that pretrial still has the discretion to change it if they find it promote to do so.

THE COURT: Yes.

MR. ABRAMS: Thank you.

THE COURT: So I think that's called continuing /KERG allowed.

Good luck to you, Mr. Battle. Thank you very much.

MR. O'BRYNE: Thank you, Judge.

(Thereupon, the excerpt testimony concluded.)

CERTIFICATE

I hereby certify that the foregoing transcript is an accurate transcript of the audiotape recorded proceedings in the above-entitled matter.

08/23/22

Bonnie Joy Lewis
Registered Professional Reporter
CASE LAW REPORTING, INC.
7001 Southwest 13 Street,
Pembroke Pines, Florida 33023
954-985-8875